E. MARTIN ESTRADA
United States Attorney
MACK E. JENKINS
Assistant United States Attorney
Chief, Criminal Division
ELIZABETH S.P. DOUGLAS (Cal. Bar No. 331031)
Assistant United States Attorney
Major Frauds Section
     1100 United States Courthouse
     312 North Spring Street
     Los Angeles, California 90012
     Telephone: (213) 894-5728
     Facsimile: (213) 894-6269
     Email:      elizabeth.douglas@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | No. 2:22-cr-00474-JLS |
|---|---|
| Plaintiff, | <u>GOVERNMENT'S SENTENCING POSITION;</u> <u>DECLARATION OF ELIZABETH S.P.</u> <u>DOUGLAS</u> |
| v. | |
| JULIA BETH CODA,<br>   aka "Julia Beth Taus,"<br>   aka "Bonfire," | Hearing Date: January 26, 2024<br>Hearing Time: 8:30 a.m.<br>Location:    Courtroom of the<br>             Hon. Josephine L.<br>             Staton |
| Defendant. | |

Plaintiff United States of America, by and through its counsel of record, the United States Attorney for the Central District of California and Assistant United States Attorney Elizabeth S.P. Douglas, hereby files its Sentencing Position for defendant JULIA BETH CODA.

This Sentencing Position is based upon the attached memorandum of points and authorities, the attached Declaration of Elizabeth S.P. Douglas, the concurrently filed exhibits, the files and records in this case, and such further evidence and argument as the Court may permit.

The government respectfully requests the opportunity to supplement its position or respond to any positions asserted by the defense or the United States Pretrial and Probation Office as may become necessary.

| Dated: January 12, 2024 | Respectfully submitted, |
|---|---|
| | E. MARTIN ESTRADA<br>United States Attorney |
| | MACK E. JENKINS<br>Assistant United States Attorney<br>Chief, Criminal Division |
| | _____/s/_____<br>ELIZABETH S.P. DOUGLAS<br>Assistant United States Attorney |
| | Attorneys for Plaintiff<br>UNITED STATES OF AMERICA |

**TABLE OF CONTENTS**

DESCRIPTION                                                            PAGE

TABLE OF AUTHORITIES....................................................i

MEMORANDUM OF POINTS AND AUTHORITIES....................................1

I.    INTRODUCTION......................................................1

II.   STATEMENT OF FACTS................................................2

      A.   Victim W.D. Obtains Custody of His Minor Daughter
           Following the Death of Defendant's Sister....................2

      B.   Defendant Makes Unsubstantiated Allegations Regarding
           Victim W.D. and Others to the FBI............................2

      C.   Defendant Researches How to Access the Dark Web..............3

      D.   Defendant Hires a Hitman on the Dark Web to Murder
           Victim W.D...................................................4

III.  THE PRESENTENCE REPORT AND USPPO'S RECOMMENDATION.................6

IV.   A 78-MONTH SENTENCE IS JUST AND APPROPRIATE HERE..................7

      A.   Nature and Circumstances of the Offense......................7

      B.   History and Characteristics of Defendant.....................9

      C.   Need to Reflect Seriousness of Offense; Promote
           Respect for the Law; Provide Just Punishment; Afford
           Adequate Deterrence; and Protect the Public from
           Further Crimes..............................................10

      D.   Need to Avoid Unwarranted Disparities.......................11

      A.   A Three-Year Term of Supervised Release, With the
           Conditions in the Plea Agreement and Recommended by
           Probation, Is Just and Appropriate..........................11

V.    CONCLUSION.......................................................12

CERTIFICATE OF COMPLIANCE..............................................13

DECLARATION OF ELIZABETH S.P. DOUGLAS..................................14

**TABLE OF AUTHORITIES**

DESCRIPTION                                                               PAGE

**Cases**

Gall v. United States,
     552 U.S. 38 (2007) ......................................... 11

United States v. Johnson,
     529 U.S. 53 (2000) ......................................... 12

United States v. Treadwell,
     593 F.3d 990 (9th Cir. 2010) ............................... 11

**Federal Statutes**

18 U.S.C. § 1958 ................................................ 1

18 U.S.C. § 3553 ........................................... passim

**State Statutes**

Cal. Health & Safety Code § 11352 ............................... 6

Cal. Penal Code § 1203.4 ...................................... 6, 7

**Other**

S. Rep. No. 98-225 ............................................. 12

U.S.S.G. § 2E1.4 ................................................ 6

U.S.S.G. § 3E1.1 ................................................ 6

U.S.S.G. § 5A .................................................. 11

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.  INTRODUCTION**

Defendant JULIA BETH CODA -- angry that Victim W.D. had obtained custody of his minor child B.D. following the death of defendant's sister, who was B.D.'s mother -- began a campaign targeting Victim W.D.  She made unsubstantiated allegations that Victim W.D. and other family members had "kidnapped" B.D.  Defendant also spent months researching how to access a hidden part of the internet, known as the dark web, in order to hire someone to cause Victim W.D. harm.  Defendant first considered hiring an individual to hack into Victim W.D.'s phone and email.  Ultimately, she decided to hire someone to murder Victim W.D., suggesting to the hitman that Victim W.D.'s death should be staged to look like an accidental overdose.  Defendant paid the hitman approximately $10,000 in Bitcoin in six, separate payments to kill Victim W.D.  Fortunately, Victim W.D. was physically unharmed, despite defendant's efforts.

For her conduct, the government charged defendant with the use of interstate commerce facilities in the commission of murder-for-hire, in violation of 18 U.S.C. § 1958(a).  (Dkt. 1.)  Defendant subsequently pleaded guilty pursuant to a plea agreement.  (Dkts. 23 ("Plea Agreement") and 25.)

The government respectfully recommends that this Court sentence defendant to 78 months' imprisonment, followed by a three-year period of supervised release; a $100 special assessment; and no fine.  The government submits such a sentence is sufficient, but not greater than necessary, to achieve the purposes set forth in 18 U.S.C. § 3553(a).  A 78-month sentence, which is at the low end of the Guidelines range after a one-level downward variance is applied,

reflects the need to hold defendant accountable for her serious and calculated offense conduct, disregard of the law, and the need for general and specific deterrence.

## II. STATEMENT OF FACTS

Victim W.D. obtained custody of his minor daughter B.D. after the young girl's mother, J.T., died. Defendant, who was J.T.'s sister and thus B.D.'s aunt, then sought to attack Victim W.D. in a variety of ways, culminating in her paying someone approximately $10,000 to murder Victim W.D.

### A. Victim W.D. Obtains Custody of His Minor Daughter Following the Death of Defendant's Sister

In May 2021, defendant's sister J.T. died. (Dkt. 28 ("PSR") ¶ 10.) J.T. was survived by her young daughter, B.D., whom she shared with Victim W.D. (Id.) Following J.T.'s death, Victim W.D. obtained full custody of his daughter. (Id.)

Defendant and her mother were given the right to visit B.D. four weekends a year in Louisiana, where B.D. lives with Victim W.D, as well as call B.D. once a week. (Id.) According to Victim W.D., during one such call defendant became angry when she heard B.D. refer to B.D.'s stepmother as "Mommy," and threw things and punched a wall. (Id.) Victim W.D. believed this call happened shortly before defendant tried to hire a hitman to kill him. (Id.)

### B. Defendant Makes Unsubstantiated Allegations Regarding Victim W.D. and Others to the FBI

In mid-July 2021, defendant -- using the false alias "Gigi Bombelle" -- contacted the FBI. (Id. ¶ 11.) She alleged that her father, G.T., and an associate were involved in a drug-trafficking scheme. She also claimed that G.T. had abducted B.D. and taken her

to Louisiana. (Id.) The FBI interviewed defendant, who continued to falsely claim her name was "Gigi Bombelle," in August 2021 regarding her allegations. (Id.)

In December 2021, the FBI interviewed defendant again. This time, defendant provider her true name and admitted that she had been posing as "Gigi Bombelle." She reiterated her prior, unsubstantiated allegations regarding her father, G.T. (Id.) However, in this interview, defendant changed her allegations and claimed that B.D.'s father (Victim W.D.) was the one who had abducted B.D., not G.T., and taken B.D. to live with him in Louisiana. (Id.) The FBI took no further action because defendant provided no credible information substantiating or corroborating her allegations. (Declaration of Elizabeth S.P. Douglas (Douglas Decl.), Ex. 1.)

Defendant may have also been responsible for spreading these unsubstantiated allegations against Victim W.D. in other ways. In an interview with the FBI, Victim W.D. recalled that his employer and others in Louisiana received letters alleging that he was involved in criminal activity and had kidnapped B.D. (Douglas Decl., Ex. 2.) Victim W.D. believed these letters came from defendant. (Id.)

### C. Defendant Researches How to Access the Dark Web

During this time, defendant also took steps to learn how to access the "dark web" and hide her identity online.[1] For example, in July 2021, defendant searched Google for "how do you use tor browser." (PSR ¶ 21.) She then accessed links through Google to articles about Tor browsers, virtual private networks ("VPN"), and the dark web. (Id.) Defendant also viewed an item called "VPN + Tor

---

[1] The dark web is a hidden part of the internet, accessible only through specialized browsers such as Tor. (PSR ¶ 14 n.1.)

3

Browser" on the Apple App Store. (Id.) Further, defendant searched for "if you change internet providers will your ip address change." (Id.)

In the winter of 2021, defendant sent text messages referring to her activity on the dark web. For example, she texted someone: "Taught myself how to use the dark web recently so o [sic] haven't left my house in like 2 weeks lol." (Id. ¶ 23(a).) Defendant also sent the following texts: "I asked him if I was using the dark web correctly . . . He was like lol what the f**k are you doing" and "I just need to hire a hacker and he was like you definitely don't need the dark web for that[.]"[2] (Id. ¶ 23(b).)

### D. Defendant Hires a Hitman on the Dark Web to Murder Victim W.D.

Starting in late January 2022 and continuing until on or about March 1, 2022, defendant used the username "bonfire" to communicate with individuals that defendant believed to be hitmen on a murder-for-hire website accessible via the dark web.[3] (PSR ¶ 14; Plea Agreement ¶ 10.)

Defendant initially sought to hire someone to hack into Victim W.D.'s phone and email. (PSR ¶ 15; Plea Agreement ¶ 10.) For example, defendant used the murder-for-hire website to send a message

---

[2] The PSR inadvertently switches the dates on which defendant sent these messages. Defendant sent the first message on January 18, 2022, and the second set of messages on December 29, 2021. The government has discussed this with the Probation Officer and understands that this was a typographical error in the PSR.

[3] At the time defendant accessed the website, although it advertised murder-for-hire services, the website administrators did not actually arrange murders for hire. Instead, the purported hitmen would correspond with people seeking murder-for-hire services and accept and keep payment for the services, without arranging to murder (or attempting to murder) anyone.

4

asking: "hey can you do iphone hacking? with remote access?" (PSR ¶ 15.) A couple days later, defendant sent another message on the website saying: "hey- can you get iphone [sic] access? RAT? How much and how fast, please let me know! i have been scammed too many times." (Id.)

Defendant then requested that an individual she thought was a hitman kill Victim W.D. and make it look like an accidental overdose on heroin or other drugs. (PSR ¶ 16.) Defendant suggested that the hit take place when Victim W.D. was alone, "maybe in the car" and indicated that "cost is not a problem." (Id.) About a week later, defendant urged the completion of the deal because she wanted to "take care of this asap." (Id.; see also Plea Agreement ¶ 10.)

As payment for the murder, defendant sent approximately $9,848.41 in Bitcoin using the internet through a series of six payments to someone who she believed was the hitman to complete the deal. (PSR ¶ 17; Plea Agreement ¶ 10.)

In March 2022, an FBI agent acting in an undercover capacity (the "UC") contacted defendant. (PSR ¶ 18.) In his communications with defendant, the UC pretended to be the hitman from the murder-for-hire website. (Id.) In a phone conversation with the UC, defendant denied knowing about the murder-for-hire website and the Bitcoin transaction. (Id.) Following this call, defendant contacted the murder-for-hire website and sought to cancel the murder contract. (Id.; see also Plea Agreement ¶ 10.)

Defendant's animosity towards Victim W.D. continued, however. In May 2022, defendant sent the following text messages in an apparent reference to Victim W.D., his family, and possibly the judge who oversaw B.D.'s custody proceedings: "I will spend the rest of my

life making sure they all go down."; "They are pure evil.  That judge.  Evil."; and "I will make sure they all burn."  (Douglas Decl., Ex. 3.)

### III. THE PRESENTENCE REPORT AND USPPO'S RECOMMENDATION

The United States Probation and Pretrial Services Office ("USPPO") issued a Presentence Report ("PSR") in which the USPPO calculated a base offense level of 32.  (U.S.S.G. § 2E1.4(a)(1); PSR ¶ 29.)  After applying a three-level reduction for acceptance of responsibility, the USPPO determined defendant's total offense level is 29.[4]  (U.S.S.G. § 3E1.1; PSR ¶¶ 36-37, 39.)

The USSPO also calculated defendant's criminal history score.  Defendant has a 2004 prior felony conviction for a Transportation or Sale of a Controlled Substance, in violation of California Health & Safety Code Section 11352(a), which was subsequently expunged in 2019 pursuant to California Penal Code Section 1203.4.  (PSR ¶ 44.)  This criminal conviction results in a criminal history score of zero, which corresponds with a criminal history category of I.  (PSR ¶ 45.)

Based on a total offense level of 29 and a criminal history category of I, the USPPO determined that the advisory Guidelines range is 87 to 108 months, followed by a term of supervised release of one to three years.  (Id. ¶¶ 101, 104.)  Because defendant's Guidelines range places her in Zone D of the Sentencing Table, she is ineligible for probation.  (Id. ¶ 106.)  The USPPO also determined that the fine range for this offense is between $30,000 to $250,000.

---

[4] Defendant pleaded guilty and has accepted responsibility for her offense, and, consistent with the plea agreement, the government therefore recommends and hereby moves for a three-level reduction in the applicable offense level pursuant to U.S.S.G. § 3E1.1(b).

(Id. ¶ 110.)  The government agrees with the USSPO's Guidelines and criminal history calculations.

The USPPO recommended that the Court sentence defendant to a term of 51 months' imprisonment -- a five-level downward variance -- to be followed by a term of three years' supervised release; and a special assessment of $100 due immediately.  (Dkt. 27 at 1.)  Because the USPPO determined defendant does not have the ability to pay a fine (PSR ¶ 98), it recommended that all fines be waived (Dkt. 27 at 1.)

**IV. A 78-MONTH SENTENCE IS JUST AND APPROPRIATE HERE**

The government recommends that the Court sentence defendant below her Guidelines range to 78 months' imprisonment, followed by a three-year period of supervised release; a $100 special assessment; and no fine, as it appears defendant lacks the ability to pay a fine (PSR ¶ 106).[5]  Such a sentence -- which is at the low end of the Guidelines range after a one-level downward variance is applied -- is sufficient, but not greater than necessary, to achieve the purposes set forth in 18 U.S.C. § 3553(a).

**A.  Nature and Circumstances of the Offense**

The nature and circumstances of the offense are serious and support a sentence of 78 months' imprisonment.  See 18 U.S.C. § 3553(a)(1).

Defendant targeted Victim W.D. over many months because she was angry that Victim W.D. obtained custody of his minor daughter B.D.

---

[5] The government recommends that the Court, at sentencing, verify that defendant has been informed of the standard conditions of supervised release enumerated in General Order 20-04 (which is included in full in the PSR), and then incorporate by reference and impose those conditions.  Restitution is not an issue here.

7

She made false reports to the FBI, originally hiding behind a fraudulent name, accusing Victim W.D. and others of "abducting" B.D. (PSR ¶ 11; Ex. 1.)  Around the same time, someone -- possibly defendant -- sent letters to those who knew Victim W.D. repeating the accusation that he had "abducted" his daughter.  (Ex. 2.)

Not satisfied with her campaign of false allegations, defendant also sought to attack Victim W.D. in other ways.  She researched how to change her IP address and access the dark web, ultimately finding what she thought was a murder-for-hire website.  (PSR ¶¶ 21-23.) Defendant originally tried to hire someone from the website to hack into Victim W.D.'s phone and email.  (Id. ¶ 15.)  But then she escalated her request, and tried to hire a hitman to kill Victim W.D. (Id. ¶ 14.)  Defendant sought to cover her tracks by suggesting that the hitman murder Victim W.D. in a way that made it look like Victim W.D. had accidentally overdosed on heroin or other drugs.  (Id.)

Defendant's offense took time and planning.  She targeted Victim W.D. in multiple ways and spent months researching how to access the dark web to hire someone to murder Victim W.D.  She also then paid the person she had hired to kill Victim W.D. approximately $10,000 in Bitcoin, in a series of six, separate payments.  (Id. ¶ 17.)  And although defendant ultimately tried to cancel her murder contract when she was contacted by the person she thought was the hitman, her animosity against Victim W.D. appears to remain, as evidenced by her subsequent text messages stating she "will spend the rest of my life making sure they all go down" (Ex. 3) and her repeated reiteration to the USPPO of her unsubstantiated allegations that B.D. was "kidnapped" (see, e.g., PSR ¶¶ 64, 73, 81).

8

The nature and circumstances of defendant's offense, including defendant's prolonged period of targeting Victim W.D. and utilizing sophisticated means to do so, justify the government's recommended sentence. Moreover, defendant's calculating actions and attempts to evade detection strongly militate against any further downward variance recommended by the USPPO or defense counsel.

**B.   History and Characteristics of Defendant**

Defendant's history and characteristics also warrant the government's recommended sentence, in particular the one-level downward variance recommended by the government. See 18 U.S.C. § 3553(a)(1).

Defendant grew up in Rolling Hills, California, with a family that was financially able to provide for "all the things [she] could ever want or need." (PSR ¶ 10). However, her father, although not physically abusive, was verbally abusive and would break things when angry. (Id. ¶ 52.) Defendant described "tiptoeing or walking on eggshells" whenever her father was around. (Id. ¶ 54.) Ultimately, defendant's parents divorced, and defendant's mother raised her. (Id. ¶ 56.) Defendant's extended family on her mother's side was also supportive and involved in her upbringing. (Id. ¶ 58.) Defendant remains "very close" with her mother and sisters. (Id. ¶ 65.)

Defendant reported to the USPPO that she began using alcohol and drugs at a young age. (Id. ¶ 78.) When she was in her early twenties, defendant participated in an outpatient rehabilitation program and became sober. (Id. ¶ 79.) As detailed in the PSR, defendant reported she was diagnosed with a serious illness in 2018. (Id. ¶ 71.) Since that diagnosis, as explained in the PSR, defendant

9

has been taking prescription medicine and using controlled substances.  (Id. ¶¶ 74, 80.)

Defendant's history and characteristics -- particularly her history with substance abuse and medical issues -- supports the government's recommended sentence of 78 months' imprisonment.  A one-level downward variance reflects that defendant's instant conduct was most likely affected by her emotional distress over her sister's untimely death, exacerbated by defendant's own substance abuse and health issues.

**C.   Need to Reflect Seriousness of Offense; Promote Respect for the Law; Provide Just Punishment; Afford Adequate Deterrence; and Protect the Public from Further Crimes**

The sentence must satisfy the need to punish defendant, as well as society's need to reflect the seriousness of the offense; promote respect for the law; provide just punishment; afford adequate deterrence; and protect the public.  18 U.S.C. § 3553(a)(2).  Those objectives justify the government's recommended sentence of 78 months' imprisonment.

Defendant's offense was serious: with extensive research, time, and planning, she hired someone to kill Victim W.D. on the dark web.  Prior to doing so, she tried to use the FBI to target Victim W.D. and others.  Those actions show a blatant lack of respect for the law, as well as her ability to use relatively sophisticated means to carry out her criminal activities.  Moreover, defendant has continued to harbor animosity against Victim W.D. and even in her conversations with the USPPO repeated her unsubstantiated claims against him.  All these facts indicate that a significant period of incarceration is

warranted to reflect the seriousness of defendant's offense and deter future crimes.

### D. Need to Avoid Unwarranted Disparities

Section 3553(a)(6) requires the Court to minimize sentencing disparities among similarly situated defendants. One way of doing so is to correctly calculate the Guidelines range and then sentence defendants within that range. See United States v. Treadwell, 593 F.3d 990, 1011 (9th Cir. 2010) overruled on other grounds by United States v. Miller, 953 F.3d 1095 (9th Cir. 2020) ("Because the Guidelines range was correctly calculated, the district court was entitled to rely on the Guidelines range in determining that there was no 'unwarranted disparity' . . . ."); Gall v. United States, 552 U.S. 38, 54 (2007) ("[A]voidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges."). Here, the Guidelines result in a sentencing range 87 to 108 months' imprisonment. See U.S.S.G. § 5A (Sentencing Table). Because the Guidelines do not fully capture defendant's history and characteristics, as explained above, the government recommends a one-level downward variance. However, any further downward variance is unwarranted and would create a disparity between defendant and other defendants "with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6).

### A. A Three-Year Term of Supervised Release, With the Conditions in the Plea Agreement and Recommended by Probation, Is Just and Appropriate

The government agrees with the USPPO's recommendation that the Court impose a three-year term of supervised release following imprisonment. (Dkt. 27 at 1.) Given the seriousness of the instant

11

offense and the other considerations stated above, a three-year period of supervised release is necessary in order to provide defendant with oversight and supervision after her release from prison. See United States v. Johnson, 529 U.S. 53, 59 (2000) ("Congress intended supervised release to assist individuals in their transition to community life."); S. Rep. No. 98-225, at 124 (1983) (describing the "primary goal" of supervised release as providing "rehabilitation").

Further, the government requests that the Court impose the supervised release conditions that the parties agreed to in the plea agreement, and which are also recommended by the USPPO.[6] (Plea Agreement ¶ 2(j); Dkt. 27 at 2-16.) As the USPPO notes, these conditions, especially those agreed upon by the parties, are appropriate in this case to protect the public from future crimes by defendant, including Victim W.D., and will provide additional oversight and supervision for defendant when she transitions from incarceration back into the community. (See Dkt. 27 at 8-9.)

## V. CONCLUSION

For the foregoing reasons, the government respectfully requests that this Court sentence defendant to 78 months' imprisonment, followed by a three-year period of supervised release; a $100 special assessment; and no fine. The government further requests that the Court impose the specific conditions of supervised release that the parties agreed to in the plea agreement and that the USPPO also recommends.

---

[6] For the Court's convenience, the government has filed the portion of the Plea Agreement with these agreed-upon conditions as Exhibit 4.

12

**CERTIFICATE OF COMPLIANCE**

    The undersigned, counsel of record for Plaintiff United States of America, certifies that this memorandum of points and authorities contains 3,266 words, which complies with the word limit of L.R. 11-6.1.

Dated: January 12, 2024
E. MARTIN ESTRADA
United States Attorney

MACK E. JENKINS
Assistant United States Attorney
Chief, Criminal Division

      /s/
ELIZABETH S.P. DOUGLAS
Assistant United States Attorney

Attorneys for Plaintiff
UNITED STATES OF AMERICA

**DECLARATION OF ELIZABETH S.P. DOUGLAS**

I, Elizabeth S.P. Douglas, declare as follows:

1. I am an Assistant United States Attorney in the United States Attorney's Office for the Central District of California. I represent the government in United States v. Julia Beth Coda, 2:22-cr-00474-JLS. I have knowledge of the facts set forth herein and could and would testify to those facts fully and truthfully if called and sworn as a witness.

2. Attached as **Exhibit 1** is a true and correct copy of a portion of an FBI report documenting the allegations made by defendant to the FBI in 2021.

3. Attached as **Exhibit 2** is a true and correct copy of an FBI report documenting an interview with Victim W.D.

4. Attached as **Exhibit 3** is a true and correct copy of an FBI report summarizing the initial review of defendant's Google and Apple accounts, as well as a portion of the attachments to that report.

5. Attached as **Exhibit 4** is a true and correct copy of a portion of the Plea Agreement in this case.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that this declaration is executed at Los Angeles, California, on January 12, 2024.

                                                /s/
                                    ELIZABETH S.P. DOULGAS