CUAUHTEMOC ORTEGA (Bar No. 257443)
Federal Public Defender
MICHAEL L. BROWN II  (Bar No. 338623)
(E-Mail: Michael_l_Brown@fd.org)
Deputy Federal Public Defender
321 East 2nd Street
Los Angeles, California 90012-4202
Telephone: (213) 894-5327
Facsimile: (213) 894-0081

Attorneys for Defendant
JULIA CODA

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA
# WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>    v.<br><br>JULIA CODA,<br><br>    Defendant. | Case No. CR 22-474-JLS<br><br>**DEFENDANT'S SENTENCING MEMORANDUM**<br><br>Hearing Date: January 26, 2024<br>Hearing Time: 8:30 a.m. |

Julia Coda, by and through counsel of record, Deputy Federal Public Defender Michael L. Brown II, respectfully requests that the Court sentence Coda to a non-custodial sentence.

Respectfully submitted,

CUAUHTEMOC ORTEGA
Federal Public Defender

DATED: January 12, 2024        By  /s/ *Michael L Brown II*
                                                            MICHAEL L. BROWN II
                                                            Deputy Federal Public Defender
                                                            Attorney for JULIA CODA

## **TABLE OF CONTENTS**

| | Page |
|---|---|
| INTRODUCTION | 1 |
| CHAPTER ONE: WHO IS JULIA CODA | 2 |
|    A. The History of Coda: Now Ready to Triumph over Trauma | 2 |
|    B. The History of Coda: The Come Up From A Cancerous Childhood | 2 |
|    C. The History of Coda: The Child, Cancer, Covid, Cause of Death & Custody | 3 |
| CHAPTER TWO: HOW DID WE GET HERE | 4 |
|    A. Nature of the Offense: The Downward Spiral & Immediate Retreat | 4 |
|    B. Post Arrest Conduct for the Offense: Resilient & Resolute | 5 |
| CHAPTER THREE: WHERE SHOULD WE GO | 5 |
|    A. The Kinds of Sentences Available: §3553(a)(3) | 5 |
|    B. The Need for a Non-Custodial Sentence | 6 |
|       §3553(a)(2)(A) Warrants a Non-Custodial Sentence | 6 |
|       3553(a)(2)(B) Supports a Non-Custodial Sentence | 7 |
|       3553(a)(2)(C) Supports a Non-Custodial Sentence | 7 |
|       Custody Will Not Provide Coda with Necessary Treatment in line with 3553(a)(2)(D) | 8 |
|    C. Coda is Atypical of Those Prosecuted for this type of Offense | 8 |
|       United States v. Phillips | 8 |
|       United States v. Turner | 9 |
|       United States v. Berkett | 9 |
|    D. Coda's Immediate Retreat & 3553(a)(6) | 10 |
| CONCLUSION | 11 |

## **TABLE OF AUTHORITIES**

**Page(s)**

**Federal Cases**

*United States v. Autery*,
  555 F. 3d 864 (2009) .................................................................................... 10

*United States v. Berkett*,
  21-cr-292-MCS ............................................................................................... 1

*United States v. Leyva-Franco*,
  162 F. App'x 751 (9th Cir. 2006) ................................................................. 10

*United States v. Phillips*,
  17-cr-498-FMO ............................................................................................... 1

*United States v. Preacher*
  631 F.3d 1201 (2011 11th Cir.) ...................................................................... 1

*United States v. Turner*,
  17-cr-787-JFW ................................................................................................ 1

**Statutes**

18 U.S.C. § 3553 ............................................................................... 1, 2, 5, 6, 8

18 U.S.C. § 1958 ..................................................................................... 1, 5, 6, 8

USSG § 2E1.4 ............................................................................................... 6

## INTRODUCTION

Ms. Coda's Criminal History Category (CHC) is I and her Total Offense Level is 27. Pursuant to the plea agreement in this case, the government recommends a low-end guideline sentence. The United States Office of Probation (USPO) recommends a variance from the guidelines here of 51 months. For all the reasons detailed below, a custodial sentence here would not serve the interests of justice.

At present, the law fails to recognize *immediate retreat* in 18 U.S.C. § 1958(a) cases. *See U.S. v. Preacher* 631 F.3d 1201 (2011 11th Cir.)(holding abandonment is not a valid defense under § 1958 and affirming district court decision to refuse proposed abandonment jury instruction). This is logical in one sense, because *immediate retreat* or abandonment is atypical to the codified charge which contemplates individuals who once taking any action, intend the result of those actions. *See Infra United States v. Phillips,* 17-cr-498-FMO*; United States v. Turner,* 17-cr-787-JFW*, United States v. Berkett,* 21-cr-292-MCS (all 1958(a) cases in the Central District of California that demonstrate the norm where those that commit a § 1958 offense intend for the outcome contemplated by the offense conduct). Ms. Coda's story is one not recognized as a defense to the offense to which she pled. However, this Court is enabled to consider her story under the sentencing factors outlined in 18 U.S.C. 3553.

1

**CHAPTER ONE: WHO IS JULIA CODA**

A.  *The History of Coda: Now Ready to Triumph over Trauma*

Coda faces sentencing for an unbelievable act committed "at a time in [her] life when [she] had been in the lowest and darkest place [she has] ever been. Ex. A. (Coda Ltr.). Approaching sentencing, Coda has not only accepted responsibility but made the necessary changes to demonstrate to this court that the offense conduct was an aberration. Her only hope is "to be heard and seen as more than this moment of weakness, of desperation, of exhaustion, of shame, guilt, regret, and remorse." *Id.*

B.  *The History of Coda: The Come Up From A Cancerous Childhood*

To understand how an otherwise law-abiding citizen such as Julia Coda[1] one day could be charged with something like this, her history and characteristics must be understood. Her numerous letters of support demonstrate that Ms. Coda is a person that is simply trying to triumph over her traumatic past. *See* Ex. B (Letters of Support). From all accounts, she is justifiably on her way. *Id.*

Julia was born the second of four girls into the Taus family. Her father, George, a Radiologist, and her mother, Susan, a Nurse, presented the picture of a perfect American family to the outside world. Inside of her home though, her "father would scream and torment … and was very verbally and mentally abusive." Ex. B$_1$. Her sister notes "Julie was targeted more by our father as a victim of his abusive ways because she was strong willed and always stood up for … siblings and held him accountable for his horrible behaviors." *Id.* "As Julie became older, her father (a licensed doctor) encouraged her drug use, leading to a horrible addiction" according to her mother Susan Taus. Ex. B$_2$. As the years passed, … the situation only got worse." Ex. B$_3$. "But Julie bounced back from that and got sober when most don't." *Id.* Julie left the family situation, "went to beauty school … and started a thriving salon business." *Id.* Julia

---

[1] Also known as Julie, Julz, etc. by those closest to her.

2

even "brought awareness to the salon community about Cambodia." Ex. B$_4$. In 2016, Julia "went to Cambodia to teach victims rescued from human and sex trafficking." Ex. B$_5$.

By age 34, Julia was stable, sober, successful in the salon business, and she was finally in a position to enjoy the come up from her traumatic childhood. Unfortunately, with adulthood would come new challenges to compete with the trauma of her childhood.

C. <u>The History of Coda: The Child, Cancer, Covid, Cause of Death & Custody</u>

Julia rebuilt bonds with her mother and sisters who "had succumbed to their father's abuse and allure of money and prescription drugs." *See* Ex. B$_3$. Julia had a particularly strong bond with her sister Jamie, who also was drugged by her father and perpetually in and out of rehab. In one of these stints in rehab, Jamie met and started a relationship with another addict - W███ D███ (aka T███). In 2016, Jamie gave birth to Julia's niece B███, and their bond grew. "T███, a habitual heroin user, left Jamie and B███ in California and returned to his old life in Louisiana." Ex. B$_5$. Julia "was readily available to help her sister. *Id.*

In 2018, Julia was diagnosed with a very aggressive form of breast cancer, which resulted in a double mastectomy. *Id*. Cancer has been a consistent struggle for Julia as she recently underwent a full hysterectomy. The cancer produced "an additional complication of a damaged nerve in her arm which required surgery," affecting her career. *Id.* The start of COVID in 2020 coupled with her health complications ended her hairdressing career.

On May 14, 2021, "Jamie was found dead on her bathroom floor" by B███. Ex. B$_1$. "The coroner indicated the cause of death was the interaction of two inappropriately prescribed controlled medications" by associates of Julia & Jamie's father. Ex. B$_2$. "Amidst her grief, [Julia] immediately stepped up to help raise her niece." Ex. B$_6$. "She was making arrangements to be a parent for her niece (create a space in her home for

her to live in, change her work schedule …etc.)" *Id*. Shortly after her sister's passing, T▓ with the help of Julia's father "literally ripped a screaming and crying B▓ from Julie's arms." *See* Ex. B$_3$. After a custody battle, B▓ was ordered to remain with her biological father. *See* Ex. B$_2$. "Julie's father was again involved in the removal of B▓ to prevent guardianship in California." *Id*.

It is against this backdrop that the offense conduct arises.

## CHAPTER TWO: HOW DID WE GET HERE

A. <u>Nature of the Offense: The Downward Spiral & Immediate Retreat</u>

After being triggered by the trauma from losing B▓, Julia became increasingly paranoid. She imagined what type of life her niece would have and if it would mirror her horrendous childhood. Julia experienced an abusive father who manipulated and drugged her. Marijuana, which had once helped keep Julia's pain at bay during chemo, became all-consuming again as in her childhood. While experiencing pain she did not want to slip into drug dependency or addiction with opioids, so she turned to marijuana based upon recommendations from doctors. Julia could no longer focus on her work. Julia spent the next few months in a paranoid state devoting all her time to investigating her sister's death, B▓'s removal, and her father's involvement in these events. Julia took this information to the FBI, medical boards, and more seeking a resolution that might save her niece. *See* Ex. A (Coda Ltr.). Unfortunately, each time she spoke with a different authority, they pointed her in another direction.

Increasingly paranoid and feeling like she had few options, Julia turned to the dark web to find a place to anonymously turn over her investigation into her father and D▓ to ProPublica. The mania clouded Julia's time on the dark web and is integral to understanding the nature and circumstances of the offense conduct.

Julia had already had a cryptocurrency account when an ad popped up online that she responded to. In her state, **none of it felt real**. Upon law enforcement contacting her

to make good on her exploits on the dark web, she had a "panic attack" because **the unreal became real**. See Ex. C. (Bates 288-9 - Interview with Taus Summary).[2] Coda contacted the murder for hire website and sought to cancel the murder contract. PSR ¶ 18. There was no sincere desire or thought process about using the dark web or fake money. There was no follow up on Julia's part or attempt to use other sites. She did not want someone to die at her behest. Immediately, she retreated and cooperated with law enforcement.

B. <u>Post Arrest Conduct for the Offense: Resilient & Resolute</u>

As she describes in her own words, since her arrest, Julia has made notable changes … to support … recovery. See Ex. A. *(*Coda Ltr.). She changed careers to avoid interactions with the web. *Id.* She began working with psychologist Laurie Schoellkopf to undergo psychotherapy since January 26, 2023. Ex. D. (Schoellkopf Ltr.). With a diagnosis of Posttraumatic Stress Disorder (PTSD) and treatment in place, the doctor notes that Julia "has shown resiliency, responsibility and hope by finding work, meeting her financial obligations and always showing up to her individual psychotherapy appointments on time. *Id.*

### CHAPTER THREE: WHERE SHOULD WE GO

A. <u>The Kinds of Sentences Available: §3553(a)(3)</u>

While both the government and USPO ask this Court for a lenient sentence in terms of the guidelines, the guidelines here would result in injustice. As noted by the USPO, the maximum term of imprisonment is 10 years. 18 U.S.C. §§ 1958(a). There is no mandatory minimum. Therefore, statutorily, Congress has invested in this Court discretion to sentence Coda as it sees fit once consulting the guidelines.

---

[2] The investigative agent specifically memorialized "Coda was scared because when she heard the man on the phone say "bonfire" and she realized it was someone from the murder-for-hire website **and that made it real for her**."

5

The guidelines in this case are 87 to 108 months. According to 18 U.S.C.A. § 3553(b)(1), a court shall sentence within guidelines unless there exists an "mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that described." Just as the law doesn't recognize immediate retreat in 18 U.S.C § 1958 cases, the guidelines under USSG § 2E1.4 do not either.

B. <u>The Need for a Non-Custodial Sentence</u>

18 U.S.C.A. § 3553(a)(2) outlines that a sentence should reflect the seriousness of the offense, promote respect for the law, and provide just punishment for the offense. It further outlines that a sentence should afford adequate deterrence to criminal conduct; protect the public from further crimes of the defendant and provide the defendant with needed education, training, medical care, or other correctional treatment.

### *§3553(a)(2)(A) Warrants a Non-Custodial Sentence*

§ 3553(a)(2)(A) states that a sentence should reflect the seriousness of the offense, promote respect for the law, and provide just punishment. The statute 1958(a) is a serious offense. Still, Congress legislated that there be no mandatory minimum for 1958(a), instead Congress decided to make punishment be in line with the outcome and not the initial offense conduct. In applying §3553 here, a non-custodial sentence promotes respect for the law by encouraging conduct like Coda's in immediate retreat rather than imposing custodial sentences for conduct such as hers. Julia was prescribed marijuana to deal with cancer and suffering manic paranoia but still retreated when snapped back into reality. A felony record and supervision with multiple conditions is severe punishment that will change Coda's life forever.

### *3553(a)(2)(B) Supports a Non-Custodial Sentence*

With respect to Julia Coda, the wake-up call came when she was contacted with respect to her offense conduct. As such, there is no need to issue a custodial sentence to afford adequate deterrence.

In terms of deterrence, there is no argument for specific or general deterrence here. In terms of general deterrence, Ms. Coda is atypical of those charged with this type of offense in that she abandoned and immediately retreated when she believed her actions to have grave consequences. To sentence her to custody would achieve the result of general deterrence to others in the future to abandon their plans (and in essence go against the goal of protecting the public). In terms of specific deterrence, Ms. Coda has done everything in her power to atone and make the situation right. It started when she immediately retreated, tried to cancel the contract, and cooperated with law enforcement. She further has sought the treatment she needs to not be a threat to anyone in the future, including the subject victim in this case.

### *3553(a)(2)(C) Supports a Non-Custodial Sentence*

As noted by her multiple letters of support – each person familiar with the charges – expresses that Ms. Coda is not a danger to the public:

- Julie has a large network of support from both friends and family who are ready and willing to help her navigate this challenging time. Julie will move forward from the traumas of her recent past and continue to be the hardworking, productive, and law-abiding person she was. Ex. $B_7$.
- I know that this experience has scared her, and she will absolutely never try to do what she did again. Julie is not a threat to society, and I know that the world is a better place with her in it. Ex. $B_3$.
- I am asking for Julia Beth to continue to be a part of our community. We need her. She is not a dangerous person as she is quite the opposite. She is a light in our community and a caretaker. Ex. $B_4$.

7

- I acknowledge that Julz's legal situation have not been without her own actions, but I have also seen a person reflect on those choices and demonstrate insight to accept responsibility. I do not believe she is a harm to society and will continue to move in the right direction. Ex. B$_8$.

### Custody Will Not Provide Coda with Necessary Treatment in line with 3553(a)(2)(D)

Here a non-custodial sentence is appropriate. There is nothing that incarceration can do here for Coda in terms of providing Julia with education, training, medical care or other correctional treatment. It should be noted that her psychologist, with the perspective of a 25-year career with the Federal Bureau of Prisons, asserts that she believes "Julia is best served through ongoing outpatient community based treatment, not incarceration." Ex. D. (Schoellkopf Ltr.).

C.   <u>Coda is Atypical of Those Prosecuted for this type of Offense</u>

Over the course of the last decade, there have been a handful of 18 U.S.C. §1958(a) cases in the Central District of California. The typical case involves the motive of revenge or scorned exes coupled with generally pecuniary individual gain. There is no need here for specific or general deterrence in this case in line with §3553(a)(2)(B). When law enforcement typically engages with individuals while investigating, generally these perpetrators demonstrate a satisfaction at the prospect of completing the murder evincing a need to protect the public such as in the following cases:

> **United States v. Phillips.** 17-cr-498-FMO. Phillips sought to murder a business colleague who left his company to avoid conflict with him. Defendant hired a Co-Defendant and paid $30,000. Law enforcement utilized his Co-Defendant to secure proof of the scheme. When the Co-Defendant gave Phillips a picture of the murder, Phillips offered Co-Defendant a job and

8

shred the evidence of the photo. Phillips proceeded to lie to law enforcement at the first opportunity and even went to trial. *See* Dkt. No. 161 (Govt. Sent. Pos. p.15-22)

***United States v. Turner***. 17-cr-787-JFW. Turner sought to murder her ex-boyfriend with hopes of collecting as beneficiary on a life insurance policy. Turner initially contemplated using acid to kill her ex-boyfriend but decided against it because she had a child that might interrupt the operation. Turner contacted a confidential human source and was highly motivated to secure the murder, offering $50,000. Turner even used a cell phone application to track the murder. Turner showed no remorse at any time before being caught. *See* Dkt. No. 45 (Govt. Sent. Pos. p. 6-7).

***United States v. Berkett.*** 21-cr-292-MCS. Berkett sought to kill his ex-girlfriend. He would not take no for an answer. In contacting a hitman on the web, he gave detailed instructions and further asked for proof of the murder via photo. When contacted by undercover law enforcement to investigate the murder, Berkett paid additional money and showed a true callous desire that the murder be completed. *See* Dkt. No. 66 (Govt. Sent. Pos. p 3-7).

The offense conduct here is truly atypical in that Coda immediately retreated when contacted. Ex. C. (*See United States v. Autery*, 555 F. 3d 864 (2009) at 867)(where Ninth Cir. upheld downward variance to probation for atypical offender in the context of Child Pornography). This offense conduct here is also aberrant in terms of Julia's life. (*See United States v. Leyva-Franco*, 162 F. App'x 751 (9th Cir. 2006) (affirming four level departure for aberrant behavior where evidence showed defendant's drug smuggling was single criminal event, with no significant planning, of

9

limited duration, and representing marked deviation from otherwise law-abiding life.) In line with other case law, a below guidelines non-custodial sentence is warranted here.

### D. *Coda's Immediate Retreat & 3553(a)(6)*

The record here shows that Julia immediately retreated which makes her unlike most prosecuted for this offense. There aren't many a) charged with this offense conduct, b) who are manic due to marijuana prescribed for cancer treatment, c) are aunts who in effort to protect a child, d) from a potential life of trauma and abuse, e) who would commit this offense conduct only to immediately retreat when reality sets in, and f) on her own accord seek the help and treatment to turn her life around. While the law at present doesn't recognize this type of retreat as a defense, the guidelines allow this Court to take it into account. There would not be any unwarranted sentence disparity if the Court imposes a non-custodial sentence here.

# CONCLUSION

For the foregoing reasons, the undersigned and Ms. Coda respectfully request that this Court imposed a non-custodial sentence.

Respectfully submitted,

CUAUHTEMOC ORTEGA
Federal Public Defender

DATED: January 12, 2024    By  /s/ *Michael L Brown II*
MICHAEL L. BROWN II
Deputy Federal Public Defender
Attorney for JULIA CODA